| | | |
|---|---|---|
| Raymond Norris, | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 3:06cv439(JBA) |
| | : | |
| Metro-North Commuter Railroad | : | |
| Company, James J. Gillies, and | : | |
| Joseph Cleary, | : | |
| Defendants. | : | |

**RULING ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [DOC. # 54]**

Plaintiff Raymond Norris brings this race discrimination action against his former employer, Metro-North Commuter Railroad Company ("Metro-North"), and former supervisors, James J. Gillies and Joseph Cleary.  Plaintiff claims discriminatory promotion denials, excessive discipline, hostile work environment, and constructive discharge in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. (Count One), retaliation in violation of Title VII (Count Two), discriminatory harassment in violation of 42 U.S.C. § 1981 (Count Three), and intentional infliction of emotional distress (Count Four).  The Defendants move for summary judgment contending that there is no evidence on which a reasonable jury could find in favor of Norris on these claims.

For the reasons that follow, Defendants' motion is granted in part and denied in part.  Summary judgment is denied with respect to the Title VII and § 1981 claims asserted against

Metro-North arising out of: Plaintiff's failure to be promoted to Assistant Power Director in 2002 once the preferred candidate withdrew from consideration; and Plaintiff's discipline for his 2004 safety violations as compared with his similarly situated peers Dillon and Lockery.  With respect to all other aspects of Counts One and Three, and to Counts Two and Four in their entirety, summary judgment is granted.

## I.    Factual Background

Defendant Metro-North is a public benefit corporation and a subsidiary of the Metropolitan Transit Authority, a public authority of the State of New York.  (Defs.' Loc. R. 56(A)1 Statement ¶ 1.)  Metro-North operates nearly 600 trains each weekday and over 300 trains each weekend and holiday.  (Id. ¶ 2.) As required by the Railway Labor Act ("RLA"), 45 U.S.C. § 151 et seq., the working conditions, rates of pay, discipline, and general rules regarding Plaintiff's employment with Metro-North are governed by a collective bargaining agreement ("CBA") with the International Brotherhood of Electrical Workers ("Union"). (Defs.' Loc. R. 56(A)1 Statement ¶ 4.)

Defendants Gillies and Cleary have each been employed by Metro-North for more than thirty years.  (Id. ¶¶ 10-11.)  Gillies has served for several years as the Director of Power Systems, a position in which he supervises several hundred employees and has authority to impose discipline in accordance with the CBA.  (Id.

¶ 10.)  Cleary is a General Supervisor, responsible for some
fifty-five employees who maintain the overhead electrical lines,
or "catenary" system, which power the trains on the New Haven
line.  (Id. ¶ 11.)  Although Cleary is a supervisor, he is
represented by the Union and has no disciplinary authority, but
may disqualify certain employees pending formal inquiry in the
case of work rules violations.  (Id.)

Norris began working for Metro-North in 1987 as a lineman
apprentice.  (Id. ¶¶ 13-14.)  He successfully tested as a Class A
lineman in 1991, and became a foreman in August 1998.  (Id. ¶
14.)  Subsequently, Norris pursued promotional opportunities and
unsuccessfully applied for several positions: Assistant Power
Director (twice); Supervisor Power Training/Procedures; and
Supervisor, Catenary Department.  Each of these positions was
filled by a white candidate.  Plaintiff sought the Assistant
Power Director opening first in July 2002, and again in September
2002.  (Id. ¶ 51.)  This was a position requiring substantial
expertise and responsibility relating to the control of Metro-
North's power system; Norris was one of two candidates for the
position.  (Id. ¶ 52.)  A panel composed of three members of the
Power Department, one of whom was African-American, conducted
structured interviews and made final decisions for the open
position.  (Id. ¶ 53.)  Norris scored consistently lower than the
other candidate except with respect to railroad and power

service, and was found to lack knowledge of new procedures and system information. (Id. ¶ 54.) In the course of Plaintiff's evaluation, the panel found that he had inaccurately represented his attendance record. (Id. ¶ 55.) The panel ultimately selected Fred Merkel, a Caucasian employee, but he rescinded his bid after learning of the hours required by the job. (Merkel Dep. at 20.) Following Merkel's withdrawal, Norris was not offered the position despite being the only remaining candidate. (Id. ¶ 57.) After the Assistant Power Director opening was re-posted in September 2002, Norris was passed over without interview; the position was awarded to a Caucasian employee perceived to have better system knowledge and attendance. (Id.) According to Darin D'Ambrosio, one of the three decision-makers, the hiring panel did not hire Norris at either stage of the process because they concluded that he was an unsuitable candidate for the position. (Id.)

In December 2002, Norris sought the Supervisor Power Training/Procedures opening in electrical training, and was one of three applicants interviewed by Patric Marchitto, the manager responsible for filling this position. (Id. ¶¶ 58-62.) Marchitto hired whom he believed to be the most qualified candidate: Jason Wood, a white, college-educated, licensed electrician. (Id. ¶¶ 60-62.) Plaintiff further contends that he applied for the position of Supervisor, Catenary Department in January 2003.

(Pl.'s Mem. at 5.) According to Norris's deposition testimony, a white lineman with four years' less experience, Anthony Anderson, was hired instead. (Pl.'s Dep. at 162–63.) However, Plaintiff never complained of his promotion denial in either CHRO/EEOC complaint, and his account conflicts with Anderson's assertion that he has been Supervisor since August 2002 (Anderson Aff. ¶ 3).

Plaintiff also complains that he has on several occasions been unfairly disciplined on account of his race. The Metro-North CBA provides a multi-step progressive discipline process. (Defs.' Loc. R. 56(A)1 Statement ¶ 5-9.) On February 18, 2004, for the second time in a short time period, Norris failed to remove a grounding device before re-energizing an overhead line, which on this occasion time caused damage to Metro-North's signal system and delayed trains. (Id. ¶ 28.) As a result, Cleary disqualified Norris from his Class A lineman position pending disciplinary review. (Id. ¶ 29.) Shortly thereafter, on February 28, Norris was cited for another safety violation. (Id. ¶ 30.) On March 4, Assistant Director David DiStasio disqualified Norris as a foreman pending pre-trial meeting, which was held on March 8. (Id. ¶¶ 31-32.) During this meeting with DiStasio, Plaintiff declined the standard discipline, and a disciplinary trial was scheduled for March 18 for the February 18 incident. (Id. ¶¶ 32-24.)

However, on March 10 Plaintiff began an extended period of medical leave for stress-related reasons during which he was absent from work for the next eighteen months, excepting seven non-consecutive weeks. (Id. ¶¶ 35–36.) Norris has offered evidence showing the severity of his stressed condition; he claims that he was suffering from the effects of harassment and preferential treatment of his white colleagues, which made him unable to perform his dangerous work for Metro-North. (Pl.'s Dep. at 260.) He was treated by two doctors for generalized anxiety disorder and major depression, for which he was prescribed Lexapro. (Id. at 264–65.) As a result of this extended leave, the disciplinary proceedings for the February incidents were delayed and rescheduled several times due to Plaintiff's difficulty returning to work. (Defs.' Loc. R. 56(A)1 Statement ¶¶ 38–40.) During this time, Metro-North sent Norris a number of notices regarding these proceedings as well as mandatory medical examinations. (Id. ¶ 77.) While Defendants' contend these were merely customary and required practice, Plaintiff points to them as further evidence of harassment.

The record contains references to other incidents that Plaintiffs characterizes as discriminatory and harassing. He describes a racial slur directed to him by the conductor of a train on which he was foreman; despite his written complaint, no discipline was imposed. (Pl.'s Dep. at 130–33.) Norris cites

one instance in January 2002 when Cleary ordered him to move 200-pound plates despite a medical note imposing weight limitations and the availability of other workers nearby.  (Id. at 139.) Plaintiff contends that he was not allowed to bump a junior foreman when returning from medical disability in 2002, causing him to work temporarily at a lower pay rate.  (Defs.' Loc. R. 56(A)1 Statement ¶ 46.)  He describes how he and his gang were required to perform dangerous non-critical work in the rain; Defendants characterize this work as necessary to avoid peak commuting delays.  (Id. ¶¶ 80-81.)  Plaintiff also claims that Cleary and Gillies refused to issue mandatory protective gear to Plaintiff's African-American subordinate, Marvin Edwards, which was otherwise provided to all linemen.  (Pl.'s Dep. at 177-182.) Norris further complains that when he was working with Edwards, Gillies abolished the only Class A lineman position in Norris's gang, resulting in the gang working in dangerous conditions, during which time Plaintiff also had difficulty getting management to respond to various safety concerns.  (Id. at 188, 199.)

Norris filed two separate administrative charges.  The March 7, 2003 charge claimed discrimination in refusing to allow Plaintiff to bump the junior foreman in March 2002, denying Plaintiff five promotions beginning in April 2002, and retaliating against Plaintiff for his participation in a civil

rights class action brought against Metro-North in the 1990s. (March 7, 2003 CHRO/EEOC Charge, Ex. 35.) The second charge, filed on March 23, 2004, alleged discriminatory and retaliatory disqualification of Plaintiff as a Class A lineman on February 19, 2004 and demotion from foreman on March 5, 2004. (March 23, 2004 CHRO/EEOC Charge, Ex. 36.)

The trial for the February 18 incident was eventually held on June 13, 2005; Norris was found guilty and given a five-day unpaid suspension, which he served. (Defs.' Loc. R. 56(A)1 Statement ¶ 41.) A week later, he was tried for the February 28 incident; this resulted in a twenty-day suspension, which was not served. (Id. ¶ 42.) In October 2005, after complaining of having to submit to a required drug screening, Norris resigned from his employment with Metro-North. (Id. ¶¶ 43-44.)

## II. Standard

Summary judgment is appropriate under Federal Rule of Civil Procedure 56(c) when the moving party establishes that there is no genuine issue of material fact to be resolved at trial and that the moving party is entitled to judgment as a matter of law. Celotex Corp. v. Catrett, 477 U.S. 317 (1986). Materiality is determined by the substantive law that governs the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). In this inquiry, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly

8

preclude the entry of summary judgment."  Id.  "Where the record
taken as a whole could not lead a rational trier of fact to find
for the nonmoving party, there is no genuine issue for trial."
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
586 (1986).

In moving for summary judgment against a party who will bear
the ultimate burden of proof at trial, the movant's burden of
establishing that there is no genuine issue of material fact in
dispute will be satisfied if he or she can point to an absence of
evidence to support an essential element of the non-moving
party's claim.  Celotex, 477 U.S. at 322-23.  "A defendant need
not prove a negative when it moves for summary judgment on an
issue that the plaintiff must prove at trial," but "need only
point to an absence of proof on plaintiff's part, and, at that
point, plaintiff must 'designate specific facts showing that
there is a genuine issue for trial.'"  Parker v. Sony Pictures
Entm't, Inc., 260 F.3d 100, 111 (2d Cir. 2001) (quoting Celotex,
477 U.S. at 324); see also Gallo v. Prudential Residential
Servs., 22 F.3d 1219, 1223-1224 (2d Cir. 1994) ("[T]he moving
party may obtain summary judgment by showing that little or no
evidence may be found in support of the nonmoving party's
case.").  The non-moving party, in order to defeat summary
judgment, must then come forward with evidence that would be
sufficient to support a jury verdict in his or her favor.

Anderson, 477 U.S. at 249 (noting that "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party").  In making this determination, the Court draws all reasonable inferences in the light most favorable to the party opposing the motion.  Matsushita, 475 U.S. at 587.  However, a party opposing summary judgment "may not rest upon the mere allegations or denials of the adverse party's pleading," Fed. R. Civ. P. 56(e), and "some metaphysical doubt as to the material facts" is insufficient.  Id. at 586 (citations omitted).

## III. Discussion

### A.    Count One: Title VII

Norris alleges that the Defendants violated Title VII in several ways: promotion denials, unfair discipline, hostile work environment, and constructive discharge.  The record is analyzed according to the McDonnell Douglas burden-shifting framework, under which Norris first must establish a prima facie case of discrimination on account of race.  Weinstock v. Columbia Univ., 224 F.3d 33, 42 (2d Cir. 2000).  To do so, he must prove: (1) membership in a protected class; (2) qualification for his position; (3) an adverse employment action; and (4) circumstances giving rise to an inference of discrimination on the basis of his membership in the protected class.  See generally McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Graham v. Long

Island R.R., 230 F.3d 34, 38 (2d Cir. 2000). If Plaintiff
establishes a prima facie case, the burden shifts to Defendants
to articulate "a legitimate, nondiscriminatory reason" for the
adverse employment actions, which is a burden "of production, not
persuasion," and can "involve no credibility assessment." Reeves
v. Sanderson Plumbing, 530 U.S. 133, 142 (2000) (internal
citations, quotations, and alterations omitted). Defendants'
burden is satisfied if the proffered evidence "'taken as true,
would permit the conclusion that there was a nondiscriminatory
reason for the adverse action.'" Schnabel v. Abramson, 232 F.3d
83, 88 (2d Cir. 2000) (quoting St. Mary's Honor Ctr. v. Hicks,
509 U.S. 502, 509 (1993)). "Although the burden of production
shifts to the defendant, the ultimate burden of persuading the
trier of fact of intentional discrimination remains at all times
with the plaintiff." Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir.
1997).

If Defendants articulate a race-neutral basis for the
adverse employment actions, the burden then shifts back to
Plaintiff to "come forward with evidence that [Defendants']
proffered, non-discriminatory reason is a mere pretext for actual
discrimination." Weinstock, 224 F.3d at 42. Norris "may attempt
to establish that he was the victim of intentional discrimination
by showing that the employer's proffered explanation is unworthy
of credence." Reeves, 530 U.S. at 143. Thus, a plaintiff's

11

prima facie case combined with sufficient evidence to find that
the defendants' proffered justification is pretextual will be
sufficient to survive summary judgment because a jury would be
permitted to infer from such evidence that real reason for the
employment action was discriminatory.  Id. at 148.

With respect to each of the Title VII claims, it is
undisputed that Norris can prove the first, second, and third
prongs: he is a member of a protected group, who performed his
job satisfactorily (with limited exceptions), and who suffered
adverse employment actions.  The remaining question is whether
the record presents a genuine issue of disputed fact on the
fourth prong of circumstances giving rise to an inference of
discrimination based on race.

### 1. Promotion denials

By showing that he was denied the Assistant Power Director
and Supervisor Power Training/Procedures promotions and that
white applicants were hired instead, Norris has made out his
prima facie case, shifting the burden to Defendants.  See, e.g.,
Zimmermann v. Assocs. First Capital Corp., 251 F.3d 376, 381 (2d
Cir. 2001) ("[T]he mere fact that a plaintiff was replaced by
someone outside the protected class will suffice for the required
inference of discrimination at the prima facie stage of the Title
VII analysis.").  However, Plaintiff failed to mention anything
about the Supervisor, Catenary Department promotion denial in his

administrative complaints or his pleadings in this case, and thus he is barred from raising it now.  Alfano v. Costello, 294 F.3d 365, 381 (2d Cir. 2000).

Regarding the Assistant Power Director and Supervisor Power Training/Procedures hiring processes, Defendants' explanation is straightforward: Norris was not hired because he was either less qualified or unsuited for the positions.  The record establishes that Metro-North had race-neutral reasons for selecting Merkel over Norris in July 2002, declining to hire Norris when he was the only remaining candidate, and hiring another white applicant over Norris in September 2002.  Specifically, Plaintiff scored consistently low on the panel's evaluation, he lacked certain system knowledge deemed especially important, and he raised questions about his reliability with his incomplete attendance records.  (D'Ambrosio Aff. ¶¶ 11–18.)  Similarly, when Norris was not selected for Supervisor Power Training/Procedures in December 2002, Marchitto viewed Plaintiff's electrician experience as outdated and comparatively inferior.  These explanations are sufficient for Defendants to meet their burden under McDonnell Douglas.

Thus, to survive summary judgment, Norris must demonstrate that Defendants' stated reasons are mere pretext for racially discriminatory action; with one exception, Norris has failed to carry this burden.  According to Metro-North's usual practice,

once Merkel withdrew from consideration for Assistant Power Director, the promotion would normally be granted to the remaining applicant.  Cleary acknowledged in his deposition that during his long service at Metro-North he cannot recall a lone remaining applicant not being given a promotion under such circumstances.  (Cleary Dep. at 120–21.)  Because "departures from procedural regularity [may] raise a question as to the good faith of the process," Stern v. Trustees of Columbia Univ., 131 F.3d 305, 313 (2d Cir. 1997) (quotation marks and alteration omitted), and because the re-posting was apparently at odds with prior Metro-North practice, there is an issue of material fact as to whether a fact-finder could infer discriminatory intent from this failure to promote.  Thus, as to the decision to not hire Plaintiff for the Assistant Power Director position once Merkel withdrew, summary judgment is denied.

However, with respect to the other promotion denials, Plaintiff's arguments fall short.  Norris offers no evidence — other than inadmissible speculation — that the employees actually hired were not in fact more qualified and that Metro-North's true motivation was to discriminate against him at least in part because of his race.  Therefore, as to all other promotion denial claims, summary judgment is granted.

### 2. Unfair discipline

Plaintiff alleges that the discipline he received in

response to the February 2004 incidents was comparatively unfair
and sufficient to satisfy the fourth prong of a prima facie case
of racial discrimination.  Norris may demonstrate that this
discipline occurred under circumstances giving rise to an
inference of discrimination "by showing that the employer
subjected him to disparate treatment, that is, treated him less
favorably than a similarly situated employee outside his
protected group."  <u>Graham</u>, 230 F.3d at 39.  Other employees cited
as comparators must "have a situation sufficiently similar to
plaintiff's to support at least a minimal inference that the
difference of treatment may be attributable to discrimination.
<u>McGuinness v. Lincoln Hall</u>, 263 F.3d 49, 54 (2d Cir. 2001).  To
be similarly situated, the employees must have been "subject to
the same performance evaluation and discipline standards" and
"engaged in comparable conduct."  <u>Graham</u>, 230 F.3d at 40.

Norris challenges Metro-North's disciplinary actions taken
against him and alleges that certain white linemen — namely, Fred
Merkel, John Frank, David Tooley, Edwin Perry, John Dillon, and
Bill Lockery — committed safety violations similar to the
February 2004 incidents but were not similarly disciplined.  Most
of these comparisons are unavailing.  The evidence shows that
Merkel committed a safety violation similar to Norris's February
18 incident, but Merkel's error caused no damage, while Norris's
damaged the signal system and delayed trains.  Norris concedes

15

that he has no personal knowledge of Frank's disciplinary records, the safety violations he allegedly committed, or whether he received discipline as a result. (Pl.'s Dep. at 229.) Likewise, neither Norris nor Cleary has any personal knowledge of the specifics of any violation committed or punishment received by Tooley. (Pl.'s Dep. at 218-19; Cleary Dep. at 145-46.) Norris contends that Perry was similarly situated, but conceded that the violation forming the basis for the comparison was not Perry's fault. (Pl.'s Dep. at 227.) Given these dissimilarities, Merkel, Frank, Tooley, and Perry have not been shown to be similarly situated to Norris with respect to the disciplinary response to the February 2004 incidents.[1]

The remaining two comparators are more appropriate. Although Metro-North has no record of the nature of any discipline imposed on Dillon for safety violations, Cleary admitted that Dillon had improperly grounded a wire in New Rochelle more than a decade prior to this action and caused an explosion which injured another worker. (Cleary Dep. at 130-31.) According to Cleary, Dillon was then suspended for one or two days. (Id. at 131-32.) In addition, Plaintiff maintains that Lockery committed a safety violation similar to the February 28

---

[1] Norris also mentions in passing several other possible comparators — e.g., Joe Chippelone, Robert Moorehouse, and Anthony Anderson — but provides no evidence other than speculation as to how the incidents or punishments are comparable. (Pl.'s Dep. at 211-12, 261-62, 189-198.)

incident but was not similarly disciplined; according to Cleary, the two incidents were comparable, yet he does not recall Lockery being demoted and suspended like Norris. (Id. at 114-15.) The record thus shows that in both cases, compared to the Dillon and Lockery incidents, Norris committed a violation which resulted in arguably less damage, yet received harsher punishment than his white peers. This establishes an inference of racially motivated discipline sufficient to make out a prima facie case of discrimination.

Metro-North counters that the non-discriminatory reason for its discipline of Plaintiff was the fact that he had committed two safety violations in a ten-day period, in addition to an uncharged incident the previous month. But assuming that this justification would show no discriminatory intent, the evidence shows that Plaintiff's discipline for the February 18 incident was harsher than that given to Dillon for a more serious violation, and that Plaintiff's punishment for the February 28 incident appears to have been disparately severe as compared with Lockery's. Further, Cleary admits that the discipline for the February 28 incident was excessive in relation to the punishments generally imposed over the course of his long tenure with Metro-North. (Cleary Dep. at 158.) As there are genuine issues of material fact as to whether, but for Plaintiff's race, he would have been disciplined less severely, summary judgment for the

claims of discriminatory discipline for the February incidents is denied.

### 3. Constructive discharge, hostile work environment

Norris claims that Defendants violated Title VII by making his working conditions at Metro-North so intolerable that he was subjected to a hostile work environment and, eventually, constructively discharged. In this case, these allegations rise and fall together. To establish his hostile work environment claim, Norris must show "that [his] workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the conditions of [his] work environment." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997). A court must assess the totality of the circumstances, including such relevant factors as the "frequency of the discriminatory conduct; its severity; whether it is physically threatening and humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993). Relatedly, "[a]n employee is constructively discharged when his employer, rather than discharging him directly, intentionally creates a work atmosphere so intolerable that he is forced to quit involuntarily." Terry v. Ashcroft, 336 F.3d 128, 151–52 (2d Cir. 2003). Whether working conditions rise to this level generally depends on two inquiries: "the employer's intentional

conduct and the intolerable level of the work conditions."
Petrosino v. Bell Atl., 385 F.3d 210, 229 (2d Cir. 2004). The
first inquiry may be satisfied by proof that "employers acted
with the specific intent to prompt employees' resignations," and
the second inquiry "is assessed objectively by reference to a
reasonable person in the employee's position." Id. at 229-30.
To establish a prima facie case under either theory, Plaintiff
must show that the discharge or harassment "occurred in
circumstances giving rise to an inference of discrimination on
the basis of [his] membership" in a protected class. Chertkova
v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir. 1996).

Plaintiff asserts that Defendants created a racially hostile
working environment by "repeatedly [denying him] promotions for
which he was well qualified," subjecting him to discriminatory
discipline, "fail[ing] to issue burn equipment to a member of his
gang," configuring his gang in an "unusually dangerous" manner,
and "continu[ing] to vengefully send [him] communications about
disciplinary pleadings and mandatory medical examinations" while
on leave. (Pl.'s Mem. at 31–32.) Norris relies on essentially
the same evidence to establish his claim of constructive
discharge: he maintains that he was forced to resign due to the
many communications he received while on medical leave, the way
in which Metro-North carried out the disciplinary proceedings,
and the requirement that he submit to a drug test in October

2005.  (Id. at 28-30.)

Even assuming arguendo that these complaints are
individually valid — which Defendants dispute — Plaintiff has not
met his burden of showing that reasonable jurors could conclude
that they were collectively so intolerable and systematic as to
materially alter his working conditions on the basis of his race.
Norris has failed to prove that he was "repeatedly" denied
promotions; as discussed supra, there is a disputed issue of
material fact as to only one such denial.  While he has provided
sufficient evidence to survive summary judgment on his
discriminatory discipline theory, this evidence does not show how
the punishment Plaintiff received in connection with the February
2004 safety violations was related to these other complaints.  In
addition, Norris's incidents with respect to his gang were too
isolated and insubstantial to have affected his working
conditions to a point of intolerability.  And despite Plaintiff's
strong language, he has provided no evidence of how the notices
he received while on his eighteen-month-long medical leave could
be considered objectively harassing or even contrary to Metro-
North's customary practice.  (See Operating Procedure No. 23-001,
Ex. 49.)

These incidents were not systematic nor continuous, but
occurred over the course of several years, and were thus
insufficiently connected by time or nature to cumulatively create

a hostile work environment or amount to a constructive discharge. See Petrosino, 385 F.3d at 221–24 (finding evidence of a sexually hostile work environment sufficient to survive summary judgment based on "incessant sexually offensive exchanges," "omnipresent sexual graffiti," and plaintiff's "sexual assault by a drunken co-worker"); Spence v. Md. Cas. Co., 995 F.2d 1147, 1153–58 (2d Cir. 1993) (granting summary judgment to employer despite plaintiff's claims that ridicule and constant performance criticisms, causing him high blood pressure, constituted a constructive discharge). Therefore, summary judgment is granted on these claims.

### 4. Claims against individual Defendants

Defendants Gillies and Cleary contend that, to the extent any Title VII claims against Metro-North survive summary judgment, they nevertheless cannot be held individually liable. According to the Second Circuit, "an employer's agent may not be held individually liable under Title VII." Tomka v. Seiler Corp., 66 F.3d 1295, 1313 (2d Cir. 1995), abrogated on other grounds, Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998); see also Mandell v. County of Suffolk, 316 F.3d 368, 377 (2d Cir. 2003). The parties apparently agree on this point (Defs.' Mem. at 10 n.5; Pl.'s Mem. at 40 n.24), and thus summary judgment is granted with respect to the surviving Title VII claims asserted against Gillies and Cleary.

**B.    Count Two: Retaliation**

A plaintiff alleging retaliation must initially establish a prima facie case by showing: that he was engaged in a protected activity; that his employer was aware of this activity; that he was subject to an adverse employment action; and that there was a causal connection between his protected activity and the adverse action.  Collins v. New York City Transit Auth., 305 F.3d 113, 118 (2d Cir. 2002).  To demonstrate that the employee engaged in a protected activity, he must show that he "had a good faith, reasonable belief that the underlying employment practice was unlawful."  Reed v. A.W. Lawrence & Co., 95 F.3d 1170, 1178 (2d Cir. 1996) (quotation marks omitted).  The causation element can then be proven "(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant."  Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000).

Norris has satisfied the first three prongs of his prima facie case.  He was involved in various forms of protected activity throughout his employment at Metro-North, of which his superiors were aware: he was involved in the 1990s civil rights class action; he filed administrative complaints during roughly

the same period; and he filed CHRO charges in 2003 and 2004.
Plaintiff also established that he experienced adverse employment
actions — specifically, his promotion denials, his discipline for
the February 2004 incidents, and his eventual resignation.

However, Plaintiff has not adduced evidence showing a causal
connection between his activity and the adverse consequences.
Causation may be satisfied by showing a sufficiently close
temporal connection between the protected activity and the
adverse action.  But "[t]he cases that accept mere temporal
proximity between an employer's knowledge of protected activity
and an adverse employment action as sufficient evidence of
causality to establish a prima facie case uniformly hold that the
temporal proximity must be 'very close,'" which usually means
closer in time than a few months.  Clark County Sch. Dist. v.
Breeden, 532 U.S. 268, 273 (2001).  In this case, the promotion
denials in 2002 occurred several years after Norris participated
in the class action and filed administrative complaints in the
1990s.  The discipline he received immediately following his
February 2004 incidents were a year removed from his first CHRO
charge, and predated his second CHRO filing.  Norris was
eventually suspended for his two safety violations, but this
discipline was assessed in June 2005, more than a year after his
March 2004 CHRO charge.  The notices he received while on leave —
to the extent they even qualify as adverse actions, as Plaintiff

contends — were similarly disconnected in time.  Finally, his

resignation in October 2005, which as discussed <u>supra</u> has not

been shown to have been the result of constructive discharge, was

simply too far removed from any protected activity to establish

causality.

Therefore, Norris has failed to carry his burden of

establishing a prima facie case of unlawful retaliation, and

summary judgment is granted on this count.

### C.   Count Three: § 1981

Norris alleges in Count Three that he was subjected to

racially discriminatory conduct in violation of 42 U.S.C. § 1981,

in essence recasting the same facts which form the basis of his

Title VII claims.  Defendants contend that Plaintiff's § 1981

claims are time-barred.  The Second Circuit has explained that

"federal courts use the most analogous state statute of

limitations in claims brought under § 1981," and that in

Connecticut, the operative statute requires a claim to be brought

"within three years from the date of the act or omission

complained of."   <u>Holt v. KMI-Continental, Inc.</u>, 95 F.3d 123, 131

(2d Cir. 1996); Conn. Gen. Stat. § 52-577.  However, the issue of

timeliness is complicated by the change in the scope of § 1981

following enactment of the Civil Rights Act of 1991, 105 Stat.

1071.  That Act was passed in partial response to the Supreme

Court's ruling in <u>Patterson v. McLean Credit Union</u>, 491 U.S. 164,

171 (1989), which had held that § 1981 "does not apply to conduct
which occurs after the formation of a contract and which does not
interfere with the right to enforce established contract
obligations." As amended in 1991, "§ 1981's prohibition against
racial discrimination in the making and enforcement of contracts
[now] applies to all phases and incidents of the contractual
relationship, including discriminatory contract terminations."
Rivers v. Roadway Express, Inc., 511 U.S. 298, 302 (1994). Of
further relevance is the catchall federal statute of limitations,
which provides that "a civil action arising under an Act of
Congress enacted after [December 1, 1990] may not be commenced
later than 4 years after the cause of action accrues." 28 U.S.C.
§ 1658.

There are thus two possible time limits applicable to
Norris's claims: the three-year period provided by Connecticut
law, Conn. Gen. Stat. § 52-577; or the four-year period provided
by federal law, 28 U.S.C. § 1658. In such a situation, "[t]he
critical question, then, is whether [the claims] 'ar[ise] under'
the 1991 Act or under § 1981 as originally enacted." Jones v.
R.R. Donnelley & Sons. Co., 541 U.S. 369, 373 (2004).
Regrettably, the parties' briefing on this matter is lacking.
Defendants argue without much elaboration that because
Plaintiff's "§ 1981 claim was first asserted on September 15,
2006, . . . any conduct that occurred prior to September 15, 2003

25

is time-barred." (Defs.' Mem. at 28 n.33) Plaintiff, meanwhile, goes too far in asserting that "the statute of limitations endorsed by the . . . Supreme Court is [four] years for any act of Congress that concerns the Civil Rights Act of 1991." (Pl.'s Mem. at 41.)

Although § 1981 is distinct from Title VII, because Norris's claims under these two statutes are premised on essentially the same facts, much of the Title VII analysis is applicable here as well. See Howard v. Senkowski, 986 F.2d 24, 27 n.2 (2d Cir. 1993); Taitt v. Chem. Bank, 849 F.2d 775, 777 (2d Cir. 1988); Jenkins v. New York City Transit Auth., 201 Fed. Appx. 44, 45–46 (2d Cir. 2006). In light of the conclusions, supra, that summary judgment is granted on Plaintiff's hostile work environment and constructive discharge claims, these theories are no more tenable when recast as violations of § 1981. Similarly, those aspects of his Title VII promotion denial and unfair discipline claims which fail to survive summary judgment suffer the same fate here. Therefore, all that remains which can support § 1981 liability are: (1) Norris's failure to be given the Assistant Power Director promotion in 2002 once Merkel withdrew from consideration; (2) Norris's discipline for his safety violations as compared with his similarly situated peers Dillon and Lockery.

Norris filed this action on March 21, 2006.[2]  If the
Connecticut statute of limitations applies, then conduct which
occurred prior to March 21, 2003 is time-barred; if § 1658
applies, then the cutoff date is one year earlier.  The
discipline Norris received in connection with the safety
violations all occurred after March 2003, and is not barred even
if the more restrictive time limit applies.  But Norris's
surviving promotion denial claim, premised on conduct dating to
mid-2002, is timely only if the applicable limitations period is
supplied by § 1658.  Thus, the critical question is narrowed to
whether Plaintiff's promotion denial claim "'ar[ises] under' the
1991 Act or under § 1981 as originally enacted."  <u>Jones</u>, 541 U.S.
at 373.  <u>Patterson</u> itself dealt in part with a failure to promote
claim, and explained:

> [W]hether a promotion claim is actionable under § 1981
> depends upon whether the nature of the change in
> position was such that it involved the opportunity to
> enter into a new contract with the employer.  If so,
> then the employer's refusal to enter the new contract
> is actionable under § 1981. . . . Only where the
> promotion rises to the level of an opportunity for a
> new and distinct relation between the employee and the
> employer is such a claim actionable under § 1981.

<u>Patterson</u>, 491 U.S. at 185.  Did the Assistant Power Director

---

[2] Contrary to Defendants' contention, Norris referenced
§ 1981 in both his original complaint and his first amended
complaint; he alleged in both filings that Defendants had
discriminated against him "in violation of 42 U.S.C. Section
1981." (Compl. at 4; Am. Compl. at 8.)  Thus, the filing date of
March 21, 2006 is the operative date for measuring the
limitations period.

Norris filed this action on March 21, 2006.[2]  If the
Connecticut statute of limitations applies, then conduct which
occurred prior to March 21, 2003 is time-barred; if § 1658
applies, then the cutoff date is one year earlier.  The
discipline Norris received in connection with the safety
violations all occurred after March 2003, and is not barred even
if the more restrictive time limit applies.  But Norris's
surviving promotion denial claim, premised on conduct dating to
mid-2002, is timely only if the applicable limitations period is
supplied by § 1658.  Thus, the critical question is narrowed to
whether Plaintiff's promotion denial claim "'ar[ises] under' the
1991 Act or under § 1981 as originally enacted."  <u>Jones</u>, 541 U.S.
at 373.  <u>Patterson</u> itself dealt in part with a failure to promote
claim, and explained:

> [W]hether a promotion claim is actionable under § 1981
> depends upon whether the nature of the change in
> position was such that it involved the opportunity to
> enter into a new contract with the employer.  If so,
> then the employer's refusal to enter the new contract
> is actionable under § 1981. . . . Only where the
> promotion rises to the level of an opportunity for a
> new and distinct relation between the employee and the
> employer is such a claim actionable under § 1981.

<u>Patterson</u>, 491 U.S. at 185.  Did the Assistant Power Director

---

[2] Contrary to Defendants' contention, Norris referenced
§ 1981 in both his original complaint and his first amended
complaint; he alleged in both filings that Defendants had
discriminated against him "in violation of 42 U.S.C. Section
1981." (Compl. at 4; Am. Compl. at 8.)  Thus, the filing date of
March 21, 2006 is the operative date for measuring the
limitations period.

position provide an "opportunity for a new and distinct relation between" Norris and Metro-North?  If answered in the affirmative, then the claim could have been asserted under the original § 1981 and is time-barred; if answered in the negative, then the claim could only have been asserted under the post-1991 version and is timely.  The evidence in the record indicates no clear answer, for the parties' briefing does not address the issue.

Given the current stage of the proceedings and the fact that the Plaintiff is the non-moving party, the Court is inclined to permit this § 1981 claim to proceed.  At the very least, there is a disputed issue of material fact as to whether the Assistant Power Director position constituted a "new and distinct" opportunity for Norris.  Therefore, as to this promotion denial claim — as well as the surviving discriminatory discipline claim — summary judgment is denied.  As to all other bases for § 1981 liability, however, summary judgment is granted.

**D.   Count Four: Intentional infliction of emotional distress**

Plaintiff claims that the facts supporting his Title VII claims in Count One also amounted to conduct by which Defendants intentionally inflicted emotional distress upon him.  To sustain an intentional infliction claim under Connecticut law, a plaintiff must show that (1) the defendant intended to cause emotional harm, or knew or should have known that such harm was likely to result; (2) the defendant's misconduct was "extreme and

outrageous"; (3) such conduct caused the plaintiff's harm; and (4) the plaintiff sustained "severe" emotional harm.  Petyan v. Ellis, 200 Conn. 243, 253 (1986).  Whether the alleged conduct was sufficiently extreme and outrageous is a question for the Court in the first instance and only "where reasonable minds disagree" will it become an issue for the jury.  Appleton v. Bd. of Educ., 254 Conn. 205, 210 (2000).  "Conduct on the part of the defendant that is merely insulting or displays bad manners or results in hurt feelings is insufficient to form the basis for an action based upon intentional infliction of emotional distress." Id. at 211.

In his brief, Plaintiff highlights certain conduct as rising to the requisite "extreme and outrageous" level, specifically: Metro-North failed to issue proper safety equipment to Norris's crew, despite his complaints; Norris's gang was forced to work without a Class A lineman; Metro-North sent Norris many notices regarding his pending disciplinary proceedings and required medical examinations while he was on leave; Metro-North unfairly disciplined him in response to his February 2004 safety violations.  While Norris undoubtedly did experience a severe emotional response (as evidenced by his medical diagnoses and extended leave), he has failed to show that Defendants intended to cause this harm through their conduct.  Moreover, these incidents are insufficiently egregious as a matter of law.  They

29

may have contributed to Plaintiff's emotional distress, but they "were not so atrocious as to exceed all bounds usually tolerated by decent society." <u>Appleton</u>, 254 Conn. at 212. Therefore, summary judgment is granted on this count.

## IV. Conclusion

Accordingly, Defendants' Motion for Summary Judgment [Doc. # 54] is GRANTED IN PART AND DENIED IN PART. Summary judgment is denied with respect to the Title VII and § 1981 claims (Counts One and Three) asserted against Metro-North arising out of: Plaintiff's failure to be promoted to Assistant Power Director in 2002 once the preferred candidate withdrew from consideration; and Plaintiff's discipline for his 2004 safety violations as compared with his similarly situated peers Dillon and Lockery. With respect to all other aspects of Counts One and Three, and to Counts Two and Four in their entirety, summary judgment is granted.

IT IS SO ORDERED.

/s/
Janet Bond Arterton
United States District Judge

**Dated at New Haven, Connecticut this <u>15th</u> day of November, 2007.**